DECISION
Plaintiff appeals the 2009-10 real market value of land identified as Account 265466 (subject property.) A trial was held by Magistrate Jeffrey S.Mattson in the Oregon Tax Courtroom, Salem, Oregon on November 17, 2010. Jerrold Claussen (Claussen), Plaintiffs president, appeared and testified on behalf of Plaintiff. Richard D. Newkirk, Commercial/ Industrial Appraiser, Benton County Assessor, appeared and testified on behalf of Defendant.
Plaintiffs Exhibit 1 through 22 and Defendant's Exhibits A and B were admitted without objection. Plaintiffs Rebuttal Evidence, dated November 30, 2010, and Defendant's Rebuttal Evidence, dated December 17, 2010, were received.
 I. STATEMENT OF FACTS
The subject property is an 18-hole daily fee golf course located in an exclusive farm use zone in Albany, Oregon. Claussen testified that the subject property, 102 acres "triangle shaped in a flood plain," has been an operating golf course since 1929. (Ptf s Ex 9; Def s Ex A at 6.) He testified that he and his partners "aim to make golf affordable in a blue collar town."
Claussen testified that the subject property's real market value on the tax roll has remained the "same" since tax year 2005-06. (Ptf s Ex 1.) He referenced a letter from Newkirk, dated December, 5, 2008, stating the subject property's "value in 2008" was "based on $0.42 per *Page 2 
square foot of land, or $1,871,964 * * *." (Ptf's Ex 3.) Claussen testified that the land value should be reduced because there are five other golf courses in the county and "business has declined." He wrote the following on the court's white board:
"Price Per Yard Indicator of Market Value — $2,340,000
"Price Per Hole Indicator of Market Value — $2,250,000
"Total Revenue Multiplier Indicator of Market Value — $2,160,000
"* * * * *
"Adjusted Value via the Sales Comparison Approach — $2,140,000"

Newkirk agreed that "golf course owners of 18-Hole facilities have been somewhat effective in cost containment even though rounds played have declined." (Def's Ex A at 22.)
In support of his testimony, Claussen referenced various articles discussing the "downturn" in the industry and commented that "many courses have closed" and many "more offered for sale," including those in Oregon. (Ptf's Exs 4 through 7.) He reviewed the "functionally obsolete" factors that should be considered in determining the real market value of the subject property. (See Ptf's Ex 15.) The parties agree that the subject property's highest and best use as improved is a golf course. (Def's Ex A at 15.) Newkirk concluded that the subject property's highest and best use, "if vacant, is for development of a farm use as permitted by the current Benton County Development Code." (Id. at 14.)
Claussen testified that golf courses are valued at "six to eight times net earnings" or "one to one and one-half gross revenue." (Ptf's Ex 4 at 3, 6.) Newkirk testified that, based on the comparable sales data, he found the "total revenue multiplier" should be 3.33. Applying that multiplier to the subject property's gross revenue of $650,000, the subject property's indicated real market value would be $2,164,000.
Claussen reviewed his income approach beginning with the gross income for tax years 2005-06, 2006-07, and 2007-08. (Ptf's Ex 17.) Next, he reviewed the average gross income and *Page 3 
net operating income before interest, taxes, depreciation, and amortization for the same years. (Id.) To the net operating income, Claussen applied an overall capitalization rate of 10 percent and reduced that computed value by the structures and personal property to arrive at "land value only" for each year and an average land value of $1,170,122. (Id.) He concluded that the income approach is the "best approach." Newkirk testified that he relied on the Oregon Department of Revenue's study and developed a "Pro-Forma Income and Expense Statement * * * for the subject property that would reflect typical income (Total Revenues) for an 18-Hole Municipal Golf Course such as the subject property." (Def's Ex A at 38.) Claussen testified that the subject property is not a "municipal golf course," stating it is not owned by "a governmental entity." Using gross income of $858,000, a 78 percent expense ratio, and an overall direct capitalization rate including property taxes of 9.04 percent, Newkirk computed an "Estimated Market Value Via Direct Capitalization" of $2,210,000 (rounded). (Id. at 39.) Newkirk concluded, like Claussen, that the income approach is the best approach and concluded that the subject property's total real market value as of the assessment date was $2,210,000 and that land real market value was $2,012,000. (Id. at 40.) Claussen submitted a revised income approach as rebuttal evidence. (Ptf's Rebuttal Evidence, dated Nov 30, 2010.) Using total revenue of $603,505, an 80 percent expense ratio, and an overall capitalization rate of 8.14 percent, Claussen determined an indicated land real market value of $1,201,760. (Id.)
Claussen testified that using the cost approach, which he identified as replacement less depreciation, the subject property's real market value would be $1,360,000. (Ptf's Ex 18.) He testified that each identified cost is his "belief and conclusion." Newkirk testified that he did not use the cost approach because there would be "age problems." *Page 4 
Claussen testified that "no two golf courses are alike," which creates a problem using the market or sales approach to value the subject property. He testified that a property most like the subject property is Watson Ranch Development located in Coos County. (Ptf's Ex 19.) Claussen testified that Watson Ranch Development sold in October 2006 for $1.53 Million. Newkirk took issue with all properties Claussen presented as comparable, specifically that Watson Ranch Development is comparable to the subject property, stating:
 "This sale is not considered appropriate in terms of golf course type (Country Club), size (165 Acres), or market conditions, i.e. this golf course includes excess but undeveloped land and suffers from considerable economic obsolescence due to the development of 4 major competing golf courses within 20 miles."
(Def's Ltr at 2, Dec 17, 2010.) The statutory warranty deed for this property stated that $1,111,264.60 was "paid by an Accommodator pursuant to an IRC 1031 Exchange." (Def's Ex E.) Newkirk reported that his "first level of review disclosed (9) sales of 18-Hole Golf Course properties in the Northwest. Five (5) sales were rejected in the initial screening process. * * * However, they were retained for analysis and discussion and in terms of overall capitalization rates." (Def's Ex A at 23.) Using four comparable sales, Newkirk computed three indicated market values:
"Price Per Yard Indicator of Market Value — $2,340,000
"Price Per Hole Indicator of Market Value — $2,250,000
"Total Revenue Multiplier Indicator of Market Value — $2,160,000
"* * * * *
"Adjusted Value via the Sales Comparison Approach — $2,140,000"

(Def's Ex A at 33, 34.) Claussen challenged Newkirk's comparable sale 1 (Oak Knoll Golf Course), showing that it was not "sold at all" and stating that it was "lease only." (See Ptf's Ex 22.) Newkirk testified that if comparable sale 1 was a lease and not a sale he would rely on *Page 5 
comparable sale 4, using the $87,500 sale price per hole to compute an indicated market value of $1,575,000. (Defs Ex A at 30.)
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of the subject property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A Highest and Best Use
The subject property is land. Land valuation is directly related to highest and best use analysis. Appraisal Institute, TheAppraisal of Real Estate 361 (13th ed 2008). Highest and best use is defined[2] as:
 "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."
Id. at 278. *Page 6 
The parties agree that the subject property's improved highest and best use is a golf course. There was no testimony that the improved use does not result in the highest value.
To determine the real market value, this court will first discuss the requirements of the burden of proof that will guide the court's analysis of the evidence presented, and second, examine the valuation approaches used by the parties to determine the subject property's real market value.
A. The Burden of Proof
As the party seeking affirmative relief, Plaintiff bears the burden of proof. ORS 305.427. "A preponderance of the evidence, meaning the greater weight of evidence or the more convincing evidence, is sufficient to sustain the burden of proof."Feves v. Dept. of Rev., 4 OTR 304, 312 (1971). The evidence presented must be competent evidence, and evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. See Woods v. Dept. of Rev., 16 OTR 56, 59 (2002);Reed v. Dept. of Rev., 310 Or 260, 265, 798 P2d 235 (1990). In order to sustain the burden of proof, Plaintiff must provide competent evidence supporting Plaintiff's determination of the real market value.
B. Valuation
Both parties used an income approach and a sales comparison approach to determine the real market value of the subject property. Claussen presented a cost approach based on his "beliefs." He did not present any evidence other than his testimony to support his "beliefs." The court finds that Plaintiff's cost approach is inconclusive, given the lack of evidence to support his "beliefs." *Page 7 
C. The Sales Comparison Approach
If there is relevant comparable sales information, the sales comparison method is used in the process of determining real market value. Swenson v. Dept. of Revenue, 276 Or 1, 4 (1976). The sales comparison approach can also be used to support the conclusions of the income approach. Appraisal Institute, TheAppraisal of Real Estate 301 (13th ed 2008).
The subject golf course has been operating for more than 80 years. It is a daily fee course in a small town and available to serve the local community. The comparability of the other courses listed in the comparable sales approach of both parties is questionable and supports the opinion held by Claussen that each golf course is not necessarily like another.
Newkirk's comparable sale 4, Alderbrook Golf Course (Alderbrook) located in Tillamook, Oregon, is an 18-hole daily fee course built in 1925 that sold six months after the assessment date for $1,575,000 or $87,500 per hole. (Def s Ex A at 36.) Even though Claussen was not familiar with Alderbrook, the description and characteristics make it appear similar to the subject property. According to Newkirk, the purchaser completely renovated (reconfigured) the front nine holes; built a new clubhouse, pro shop, and locker rooms; and opened a restaurant and pub. (Def s Rebuttal Evid, Ex F at 2.) There was no explanation why the purchaser was willing to make such a substantial investment in that property. Unlike the subject property, Alderbrook has little competition from neighboring golf courses. Except for the sale of a subject property, the court does not place substantial reliance on one sale to determine real market value.
D. The Income Approach
The income approach relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income [that the property will produce]."Allen v. Dept. of Rev., 17 OTR 248, 253 (citation omitted). The income approach is widely used when *Page 8 
appraising income-producing properties. Although there are two techniques for determining the expected future income, direct capitalization and discounted cash flow, both appraisal reports relied upon the direct capitalization analysis approach to determine the subject property's real market value.
1. Direct Capitalization
The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. PacificPower Light Co. v. Dept. of Rev.,286 Or 529, 542, 596 P2d 912 (1979). The income approach should also consider the past earnings of the subject property and the rate of change of its income. Id.
To determine a property's real market value, the direct capitalization analysis divides the forecast net operating income of the property for the tax year by the capitalization rate. Newkirk computed an "unloaded" capitalization rate of 8.14 percent and an overall capitalization rate of 9.04 percent. (Def s Ex A at 39.) Claussen used Newkirk's "unloaded" capitalization rate in his revised income approach. (Ptf s Rebuttal Evid, Income Approach.) The court will use Newkirk's overall capitalization rate of 9.04 percent that includes property taxes.
The parties dispute the amount of the forecast net operating income to determine the subject property's real market value. To determine the forecast net operating net, the parties each forecast amounts for total gross revenue and total expenses for the golf course.
2. Forecast Revenue
Claussen relied on the subject property's historical and actual revenue and expenses in the process of generating forecast revenue and forecast expenses. He concluded gross revenue to be $603,505. (Ptf s Rebuttal Evid, Income Approach.) Newkirk stated that "[f]or purposes of *Page 9 
this appraisal analysis, Total Gross Revenue is estimated at about $650,000, or an estimated decline of 2% from the previous year." (Def s Ex A at 37.) Even though he estimated gross revenue to be $650,000, Newkirk's Income Approach used a total revenue amount of $858,000. (Id. at 39.) That revenue amount was based on 33,000 rounds of golf, even though Claussen's testimony and evidence showed a year to year decline in the number of rounds of golf and no record of gross revenue ever approaching Newkirk's total revenue amount. The court concludes that $650,000 is a reasonable stabilized gross revenue. .
3. Forecast Expenses
The parties' estimate of an expense ratio was similar. Claussen's expense ratio was 80 percent and Newkirk's expense ratio was 78 percent. Given the lack of the difference between each party's forecast expense ratio, the court finds that 79 percent is a reasonable expense ratio.
4. Direct Capitalization — Real Market Value Determination
After subtracting the forecast expenses from the $650,000 forecast revenue, a net operating income of $136,500 is forecast. Using the overall capitalization rate of 9.04 percent, the indicated real market value of the subject property is $1,510,000 (rounded.)
E. Reconciliation — Real Market Value
The court finds the income approach to be the best valuation method for the subject property. The estimated real market value of $1,510,000 determined by the income approach is supported by Defendant's comparable sale 4.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that the subject property's 2009-10 total real market value is $1,510,000. That real market value must be *Page 10 
reduced for personal property, $106,492 and improvements, $198,000, to determine the subject property's land real market value as of the assessment date. (Def s Ex A at 39, 40.) Now, therefore,
IT IS THE DECISION OF THIS COURT that the land real market value of the subject property identified as Account 265466 for tax year 2009-10 is $1,205,508.
Dated this ___day of April 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on April 7, 2011. The Court filed and entered this documenton April 7, 2011.
[1] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to year 2007.
[2] OAR 150-308.205-(A)(1) entitled "Real Property Valuation for Tax Purposes" states that:
 "(e) `Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value. See The Appraisal of Real Estate, 12th edition (2001)." *Page 1